PHILADELPHIA RUBBER WORKS CO. v. PORTAGE RUBBER CO.

(District Court, N. D. Ohio, E. D. April 8, 1915.)

No. 149.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—PROCESS FOR DEVULCANIZING RUBBER WASTE.

> The Marks patent, No. 635,141, for a process for devulcanization of vulcanized rubber waste, is void for lack of novelty and invention in view of the prior art, and also for indefiniteness in stating the degree of heat to be applied during the process and the time during which it should be continued; also *held* not infringed, if valid.

In Equity. Suit by the Philadelphia Rubber Works Company against the Portage Rubber Company. On final hearing. Decree for defendant.

Charles Neave, of New York City, for plaintiff.

Francis J. Wing, of Cleveland, Ohio, and Hagelbarger, Mottinger & Doolittle, of Akron, Ohio, for defendant.

CLARKE, District Judge. This is a suit in which infringement of United States letters patent No. 635,141 is claimed and the usual injunction and accounting are prayed for. The specification of the patent in suit states the object of the claimed invention to be:

> "The devulcanization of rubber in vulcanized rubber waste, and the reclaiming of such rubber in a condition capable of being used for the various purposes for which fresh rubber is used and of being revulcanized."

It is also stated in the specification that:

> "The invention consists in subjecting the ground rubber waste when submerged in a dilute alkaline solution—as for example, a 3 per cent. solution of caustic soda—to the action of great heat, say from 344° to 370° Fahrenheit, more or less, for 20 hours, more or less, under conditions which prevent the evaporation of any considerable quantity of the solution."

It is claimed for the process that it so removes vegetable fiber and sulphur from vulcanized rubber that, when the product of the process is thoroughly washed to remove the chemicals, there remains devulcanized rubber having substantially the characteristics of fresh rubber and capable of being used in like manner and for like purposes.

The process described consists in submerging the finely ground rubber waste in a dilute alkaline solution in a tightly closed vessel, which is inclosed within an outer vessel so constructed that by letting steam into this outer vessel the rubber waste and the solution in which it is submerged may be kept at a temperature of substantially 344° Fahrenheit for a period of not less than 20 hours.

The patent contains but a single claim, as follows:

> "The described process for devulcanizing rubber waste which consists in submerging the finely-ground rubber waste in a dilute alkaline solution in a sealed vessel, in heating the contents of the vessel to a temperature of 344° Fahrenheit, more or less, substantially as specified, and in maintaining said temperature for 20 hours, more or less, substantially as specified."

In its answer the defendant claims, first, that the patent is void for want of novelty. It is also claimed, in the alternative, that if the patent shall be held valid it should be strictly limited to the precise process described in the letters patent, and that the only departure from what was familiar practice in the art before this patent was allowed consists in stating a specific temperature at which the materials must be maintained during the process, and the number of hours until completed.

The defendant also denies that it is guilty of infringement, and claims in the testimony introduced that what it has done in the way of reclaiming rubber waste differs from the process described in the patent in suit, and has been done pursuant to the process described in United States letters patent No. 993,485, dated May 30, 1911, and granted to Wildman and Christy.

What the defendant does is described by complainant's witness, Shanks, as placing about 700 pounds of the ground rubber waste in a tank, and by the use of steam cooking it with muriatic acid for about 1½ to 2 hours. The product is then cooled with water and left to settle for about 30 minutes, when the tank is drained, and about 45 pounds of caustic soda put into it, and the mixture pumped into a retort filled up to within a foot of the top with water. This retort is then kept for 7 hours with a boiler steam pressure of 120 pounds. The product is then cooled and run through a rotary washer, and it then goes into a press, which squeezes the water out of it, resulting in the product which it is claimed is substantially similar to that obtained by the process of the patent in suit.

The application for the patent in suit was filed on February 27, 1899, and it contained three claims, all of which were rejected March 28, 1899. On April 20, 1899, the application was amended by substituting one claim for the three claims of the first application. On May 9, 1899, this claim was rejected for want of patentable novelty in the process, when considered in connection with the prior state of the art, and upon references given.

Notwithstanding this rejection, the department permitted further argument by counsel and the introduction of an affidavit by the applicant, which was accompanied by samples of the reclaimed rubber, with the result that the patent was allowed on October 17, 1899.

Claim 2 of the original application reads as follows:

Claim 2: "The process of treating vulcanized rubber waste which consists in submerging the ground rubber waste in a dilute alkaline solution, and in heating the mixture to a high temperature and maintaining that heat for a long period and at the same time preventing any considerable evaporation of the solution, substantially as specified."

The single claim allowed in the patent has been quoted in this opinion.

When the court came to examine this record it was discovered that the file wrapper and the testimony disclosed that the patentee was an educated and experienced chemist, being at the time of his application superintendent of a rubber company at Akron. In the affidavit which he filed in support of his application he gives the results of his

own experiments in applying the examiner's reference to the publication of Hoffer.

It also appears in the evidence that one of the plaintiff's expert witnesses, Fox, went into the employ of the rubber company, by which the patentee was then employed, in June, 1899, and immediately began experimenting in collaboration with the patentee, for the purpose of determining the amount of the caustic solution and the degree of heat which could be used to the best advantage in reclaiming rubber, and that he reported his results to Mr. Marks, although the claim allowed, specifying with great precision the degree of heat to be used and the time it must be maintained, was filed on April 20th of that year.

It also appeared that it is undisputed in the record that in vulcanizing rubber there is a chemical combination of the rubber with sulphur, and that the Marks patent process does not dissolve this chemical union and separate the rubber from the sulphur; that no process was known at the time the Marks patent was applied for and granted, and that no process is yet known, by which the sulphur combined with rubber in the process of vulcanization can be removed without destroying the rubber, and that rubber which has once been revulcanized and then devulcanized by the Marks process does not have all the characteristics, or substantially the same characteristics, as fresh crude rubber—the record showing that it is not used for all of the purposes for which crude rubber is used, and that it is much cheaper, because it is an inferior article.

With these facts before it, and noting that the specification of the patent in suit declares that the invention has for its object the devulcanizing of rubber in vulcanized rubber waste and the reclaiming of such rubber "in a condition capable of being used for the various purposes for which fresh rubber was being used, and of being revulcanized," and noting also that the specification declares that the result of the process is "devulcanized rubber having substantially the characteristics of fresh rubber and capable of being used in like manner and for like purposes," and also that in the arguments presented in support of the application it is distinctly declared that the process has the effect of breaking down the chemical union between the sulphur and rubber in vulcanized rubber, the court was of opinion that the record showed that the patentee, being an experienced chemist, must have known at the time he applied for the patent that the claim that the chemical union between the sulphur and the rubber was broken down by his process was not true, and since it seemed very obvious from the file wrapper that this claim constituted the only advance in the process upon what had gone before, and was therefore the reason for allowing the patent, the conviction became very strongly settled in the court's mind that the patent had been obtained by deliberate fraud on the part of the patentee. The court, however, concluding that the state of the pleadings was such that the question of fraud in obtaining the patent could not properly be considered, and that if it were made, justice required that the plaintiff should have an opportunity of meeting such a claim, counsel for the defendant was requested to amend his answer by setting up fraud in obtaining the patent, which was done.

The court then notified the parties that further testimony would be taken, limited to the question of fraud in obtaining the patent made by the amendment to the answer. Considerable testimony was taken on this question, with the result that the court is persuaded that the proof is not sufficient to justify setting aside the patent on the ground of fraud in procuring it.

The state of the knowledge of the chemistry of rubber and of the chemical combination of rubber with sulphur involved in vulcanization was in 1899, and still is, much less definite than the court supposed that it was from the reading of the record. The plasticity obtained in the product of the Marks process is such that the patentee claims that he honestly supposed at the time, and that he still believes, that the process produces some sort of a change in the chemical combination of sulphur and rubber existing in the vulcanized-rubber treated, but that he is satisfied now that it does not result in a complete breaking down of chemical union.

While the court is persuaded that the representation that the chemical union of the sulphur with the rubber was dissolved by the process was the occasion of the granting of the patent, and while this claim certainly was not true in the scope in which it was made, yet the evidence is not sufficient to justify a finding that Marks had such knowledge upon the subject that his representation was a deliberately false one, and therefore there will be no finding that the patent is void for fraud practiced in obtaining it.

Passing to a consideration of the validity of the patent in view of the state of the prior art, and comparing the claim allowed in the patent with claim 2 in the original application, as supplemented by claim 3 in the original application, both of which were rejected, and the rejection acquiesced in by the applicant, it seems very clear what the department conceived to be an invention or discovery by Marks consisted in the exact temperature to which the dilute alkaline solution must be raised in the process, and the time during which that temperature must be maintained to accomplish the desired result, and, when the extent to which the art had advanced at the time the application was made is considered, it must be concluded that the range of equivalents allowed must be an extremely narrow one, for it is just as essential that "the public should be protected against unwarranted monopoly, as much as the inventor" should be protected "against piracy." Union Match Co. v. Diamond Match Co., 162 Fed. 148, 89 C. C. A. 172; Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 26 L. Ed. 149.

The patented process consists in submerging finely ground rubber waste in a dilute alkaline solution in a sealed vessel, and in heating the contents of the vessel to a temperature of 344° Fahrenheit, more or less, and in maintaining said temperature for 20 hours, more or less, substantially as specified.

The question for decision is: Was this process so new and novel as to constitute that invention and discovery for which it is the policy of the law to grant a monopoly.

The record shows that the recovery of rubber from rubber waste in a form such that it might be used again has been a result much

sought after by inventors ever since vulcanization of rubber brought it into general use.

The patents relating to the subject range in dates from the Beer United States patent, No. 12,983, dated May 29, 1855, and the English patent to Christopher & Gidley No. 1,461, dated 1853, to the date of the patent in suit. The advent of the automobile and the extensive use of rubber tires, of course, greatly increased this interest and activity in later years.

That the use of "a dilute alkaline solution" to "devulcanize" rubber, meaning a more or less perfect restoration of vulcanized rubber to a state in which it might be used as crude rubber was used, was well and commonly known, is clear from the following United States patents:

| | | |
|---|---|---|
| Hall, | No. | 19,172—1858. |
| Hayward, | " | 40,407—1863. |
| Mitchell, | " | 249,970—1881. |
| Chadwick, | " | 288,013—1883. |
| Bourn, | " | 292,891—1884. |
| Mitchell, | " | 300,720—1884. |
| " | " | 395,987—1889. |
| " | " | 419,697—1890. |

These British patents prove the same thing:

| | | |
|---|---|---|
| Christopher & Gidley, | No. | 1,461—1853. |
| Heinzerling & Liepmann, | " | 2,495—1875. |
| Gomess, | " | 10,528—1891. |
| Anderson, | " | 18,008—1898. |

To this proof that the subject was common knowledge must be added the publication by Hoffer in 1883, referred to by the department, and especially to chapter 29, entitled "Waste and Its Utilization," which appears in the record.

It is equally clear that it was well known before the Marks application that better results were obtained when the ground rubber and alkaline solution were treated by exposure to a high degree of heat in a closed vessel, as is shown in the following patents:

| | | | | | |
|---|---|---|---|---|---|
| U. S. Patent No. | 395,987 | to Mitchell | dated | 1889. |
| " " " | 419,697 | " " | " | 1890. |
| " " " | 308,189 | " Montgomery | " | 1884. |

The Mitchell patent, No. 395,987, comes very close to being, if indeed it is not, a clear anticipation of the process of the Marks patent, claiming as it does in the first claim of the patent:

"An improvement in reclaiming rubber from waste, consisting in heating the waste immersed in the reclaiming solution in a closed vessel under pressure above the ordinary boiling point, of such solution substantially as described."

And in the second claim, describing the use of a closed vessel under pressure to about 340° Fahrenheit, substantially as described. And in the third claim describing the processes patented as "consisting in treating the waste with a reclaiming solution, so as to corrode the

fibrous matter, and then washing out the products of corrosion, and steaming the rubber at a high temperature and pressure" substantially as described. When, turning from these claims, we find the description to include subjecting the waste to the action of reclaiming reagents, such as a solution of caustic alkalies or acids, which act upon the fibrous matters, and in some cases also upon the mineral compounds, so as to form products which can be washed out, leaving the rubber in a more or less pure condition, it becomes difficult to see what advance the Marks patent makes upon this Mitchell patent. Precisely the treatment of the Marks patent is suggested, even to the degree of heat adopted.

The reading of these patents referred to, and assuming, as we must assume, that Marks had knowledge of them when he filed his application, makes it convincingly clear to this court that there is no such advance upon the state of the prior art shown in the Marks patent as rises to the dignity of invention, and the patent will therefore be decreed to be void for want of novelty and invention.

While it is not necessary for the court to go further in the discussion of this case, yet I think it proper to say that, if the patent had been found to be a valid one in the opinion of this court, it would have been limited to the precise terms expressed in the one claim allowed by the Patent Office, and since the process used by the defendant is so distinctly different from that of the patent in suit, it being neither a chemical nor mechanical equivalent of it, and especially since the record shows that the acid treatment was in use long before the Marks patent was granted, and also shows that the plaintiff claims the superiority of the Marks process over the acid treatment to be that it results in a very superior product, I am of opinion that there is no infringement by the defendant. I cannot help noting, also, that the claim allowed in the Marks patent is extremely indefinite, consisting as it does in heating the contents of the sealed vessel to a temperature of 344° Fahrenheit "more or less," and in maintaining said temperature for 20 hours, "more or less." Such a claim really leaves the whole subject in such an indefinite state as to leave the user to the necessity of experimenting to find out how the process must be used in order to realize the claimed advantage of it.

The testimony of Expert Fox shows that after the filing of the claim allowed, which purports to state the temperature ("more or less") to which the materials must be raised and the time ("more or less") for which they must be maintained at that temperature, he (Fox) was engaged under the direction of the patentee in experimenting for the purpose of determining the amount of the caustic solution and the degree of heat which could be used to best advantage in the process. This also suggests that the user of the process is left by the patent to experiment for the purpose of obtaining the results claimed for it, and this does not fulfill the statutory requirement (Rev. St. § 4888 [Comp. St. 1913, § 9432]) of definiteness in valid patents, as was said by the Circuit Court of Appeals for this Circuit in Overweight Counterbalance Co. v. Vogt Machine Co., 102 Fed. 961, 43 C. C. A. 80, citing as authority for this conclusion Howard v. Stove Works, 150 U. S. 167,

14 Sup. Ct. 68, 37 L. Ed. 1039, and In re Incandescent Lamp Patent, 159 U. S. 465, 16 Sup. Ct. 75, 40 L. Ed. 221.

A decree will be entered in conformity to this opinion, finding the patent in suit void for want of novelty and invention.